IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2001

## STATE OF TENNESSEE v. EDWIN BEARD

**Appeal from the Circuit Court for Maury County**
**No. 11443     Robert L. Jones, Judge**

---

**No. M2000-02886-CCA-R3-CD - Filed August 7, 2001**

---

After a jury trial, Defendant was found guilty of the included offense of simple assault in two counts and the jury assessed fines of $5,000 for each count. Defendant was subsequently sentenced to 11 months and 29 days on each count to run concurrently. The sentence was suspended except for 12 days to be served consecutively or six consecutive weekends. The fines were remitted to $500 for each count. In this direct appeal as of right, Defendant asserts that the jury and court erred in finding Defendant guilty, beyond a reasonable doubt, in two counts of simple assault based upon the sufficiency of evidence. We conclude that the evidence was sufficient to support Defendant's two convictions for simple assault. Thus, we affirm the trial court's judgment.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which DAVID G. HAYES, J., and THOMAS T. WOODALL, J., joined.

Rick C. Osborn, Columbia, Tennessee, for the appellant, Edwin Beard.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

## OPINION

At trial, Kim Westlund testified that in March 1999, she rented a residence from the Defendant, located at 5822 Fly Hollow Road, in Maury County, Tennessee. She stated that she paid a monthly rental payment of $800.00. She notified Defendant that she was moving and would be out of the home by November 1, 1999. She had removed most of her belongings from the residence except for some trash cans, some last minute articles and a goat. On October 30, 1999, she and her son, Warren Ashworth, went to the property. About 11:30 a.m., she pulled into the driveway leading to the house. The driveway is about a half mile from the entrance to the house. As they pulled in, Defendant was just coming out of the driveway. She testified that she told Defendant, "I've come to get my goat." Defendant started yelling that we had trashed the place and that there were stains

on the carpet. Defendant stated, "There looks like there is blood all over the carpet." Defendant followed Westlund up the driveway and pulled his truck alongside of them. Mrs. Westlund went to the Defendant's driver window. Defendant began yelling for her to get off his property and that she had no business there. Her son joined her at the truck's side and told Defendant, "Just be quiet. We just come to find my mom's goat, and we'll be out of here." Mrs. Westlund testified that "at that point, he pulled a gun and stuck it in my face, about an inch from my face." He said, "I'll kill you." He says, "I'll kill you, you effing bitch. I'll kill you. Get off my property." I said, "I'm out of here. I'm gone. Don't worry, I'm gone." She stated Defendant then turned the gun on her son and fired a shot at him. Mrs. Westlund went to her jeep and Defendant got out of his truck and stood between the passenger's door and her son. Defendant fired a couple of more shots at her son, at close range towards his feet. Defendant backed away. Ashworth got in the jeep and they started to leave. Defendant was still screaming, "I'll kill you, you crazy bitch. I'll kill you," and fired a couple of more shots at her jeep. Mrs. Westlund reported the incident to the Maury County Sheriff's Department.

During cross-examination, Mrs. Westlund acknowledged that she had threatened a lawsuit against the Defendant over his intention to remove a mobile home from the property. She denied threatening Defendant about him running over her 14 year old dog which later died as a result of the accident. She stated that the gun "looked like a .22" caliber pistol.

Warren Ashworth, age 19, testified that he and his mother went to her residence on Fly Hollow Road to look for her goat and help her pack some trash. As they pulled into the driveway, they met the Defendant. Defendant started yelling about the house being messed up and spots on the carpet. Ashworth did not know what the Defendant was talking about since he did not live at that property. His mother told Defendant they were there to look for the goat and to get the trash. They drove to the back of the mobile home. Defendant followed them and parked his truck next to their jeep. Defendant became irate, yelled and screamed at his mother, and called her "a crazy bitch." Ashworth stepped up and said, "Hey, we're just here to get the goat. Shut up and we'll be out of here." Defendant then pulled a gun and stuck it in his mother's face. He stated that the gun looked "like a little .22 pistol." Defendant kept saying, "I'll kill you, you crazy bitch. Get off my property. I'll kill you. I'll kill you." His mother ran and got in the jeep. Defendant turned the gun toward Ashworth and said, "And you, boy, don't you ever tell me to shut up," and pointed the gun at him and walked toward him and fired between his legs a couple of times. Ashworth stated that he backed up and then jumped in the jeep and they took off. While they were leaving, Defendant was still yelling, "Get off my f--king property. I'll kill you. I'll kill you." Although Ashworth had seen Defendant two or three times before, he had never spoken to Defendant. Ashworth stated that the shots were loud and as they were leaving, he heard more shots.

On his own behalf, Defendant testified that he owned the property on Fly Hollow Road and rented the house to Kim Westlund and her husband. Adjacent to the house was a mobile home that he rented to some friends of the Westlunds. On the night of October 29, 1999, Defendant was called to the house because of a broken water connection in the laundry room. Defendant found three inches of water throughout the house. Defendant had the broken connection repaired. On the

morning of October 30th, Defendant returned to the house and learned that the Westlunds had moved out.  Before this date, Defendant and the Westlunds had some conflicts as to who would pay for the pouring of some concrete pads for the carport.  They also had some words when she hooked her dog to the winch of his truck and the dog was injured while he was trying to leave.  Westlund took the dog into the house and laid it on the new carpet and got bloodstains on it.

On the day in question, Defendant had arranged for Mike Rogers to do some work for him. Rogers wanted to build a stand for hunting and to also help Defendant do some work.  About 11:00 a.m., Defendant left to go get he and Rogers something to eat when he came upon the victims at the entrance of the driveway.  "I pulled over and stopped, 'cause I didn't really, you know, pull in front of them, but I crowded them over to the side of the road, 'cause I wanted them to stop."  They got into an argument about the bloodstains on the carpet and Westlund said, "Well, all it takes is a steam vac."  Defendant told them to leave, and Westlund said, "I'm going to look for my goat."  Defendant told her the goat had been gone for two weeks.  Defendant stated that he called the Maury County Police Department.  The victims went up to the house and Defendant parked his truck about 15 feet away from them.  Westlund started calling for her goat.  Defendant said, "It's gone."  "Now y'all leave.  This is my property.  I don't want you on here.  You have already caused me enough trouble." "Get in it and get the hell out of here."  Westlund came over to the truck and got in Defendant's face, so he said, "Look.  Get out of here."  Ashworth said, "Hey you.  Shut your face."  Ashworth walked towards Defendant and Defendant opened his truck door and Westlund said, "Look, Mr. Beard, we're leaving."  Defendant responded, "Well, just do it. . ." "I'm going to call the police, and I'm going to sue you for the damages. . ."  As they were leaving, Defendant saw Rogers standing near the barn.  Defendant denied threatening or cursing the victims.  He also denied that he pulled a gun and shot at Ashworthon or the jeep.  Although Defendant denied calling Mrs. Westlund a "bitch," he did call her a "bimbo."

Mike Rogers testified that he arrived at the Defendant's place on October 30, 1999, about 11:00 a.m.  He was going to build a deer stand for hunting.  Rogers parked his truck behind the barn near the lumber and heard Defendant leaving.  He then heard a little white car return.  Defendant was behind the car when both occupants began arguing back and forth.  They appeared to be arguing over a goat.  Although Rogers heard some bickering and some curse words, he did not hear any gunshots or threats of violence.  Rogers did not see Defendant with a gun, nor had he seen one in Defendant's truck.

Mrs. Birtha Shouse testified that she has lived next to the Defendant's entrance to his property for over 30 years.  She has known the Defendant for 11 years.  She estimated that her home is about a thousand feet from Defendant's house.  She stated that sometimes she can hear voices from the house if they speak loud enough and she can also hear Defendant leaving with his dog on the truck.  She stated that on the date of the incident, she heard them "having a fuss at the mailbox." They were having a heated argument and Edwin said, "Just turn that thing around and get it out of the hollow."  "However, they went on by him and he turned and went after them."  She could not hear the talk at the house.  Later she heard a car leave then saw Defendant come out.  Mrs. Shouse stated she did not hear any gunshots.

Sally Beard, Defendant's ex-wife, testified that she had a conversation in the summer of 1999 with Mrs. Westlund. The conversation was about the Defendant wanting to evict the couple who rented the mobile home so that he could move it. However, her husband had never indicated that he wanted to do this. She stated that her ex-husband owned a Colt revolver that belonged to her father.

During rebuttal, Mrs. Westlund testified that she never saw Mrs. Shouse nor Mike Rogers. As to her conversation with Mrs. Beard, she stated that she talked to her about the concrete job and not about the problem with the mobile home.

## LEGAL ANALYSIS

Although Defendant was indicted for two counts of aggravated assault, Defendant asserts that the evidence adduced at trial is insufficient to support convictions for the included offense of simple assault. The State would argue otherwise.

Tennessee Rules of Appellate Procedure 13(e) prescribes that "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Smith,* 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173, 176 (Tenn. 1963); *State v. Buggs,* 995 S.W.2d 102, 105-06 (Tenn. 1999); *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992).

In its review of evidence, an appellate court must afford the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982); *See State v. Smith,* 24 S.W.3d at 279. The court may not "reweigh or re-evaluate the evidence" in the record. *State v. Evans,* 838 S.W.2d at 191. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. *State v. Tuggle,* 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Morris,* 24 S.W.3d 788, 795 (Tenn. 2000).

Since Defendant was accused of aggravated assault, the trial court instructed the jury of the elements of this offense. That is Defendant intentionally or knowingly caused Kim Westlund and Warren Ashworth to reasonably fear imminent bodily injury and that Defendant used or displayed a deadly weapon. Also, the trial court instructed the jury as to the elements of reckless endangerment, whose elements are similar to aggravated assault. Then the trial court instructed the jury that it could consider the included offense of assault. To convict a person of simple assault, the

jury was informed that the State must prove beyond a reasonable doubt that Defendant intentionally, knowingly or recklessly caused another to reasonably fear imminent bodily injury. Defendant contends that since the victims did not testify that they were in fear of their safety or bodily injury at the mailbox, or at the confrontation at the back of the house, but only when an alleged gun appeared, there is no evidence of a simple assault. In essence, Defendant would have this panel substitute its judgment of the facts and find Defendant not guilty. We decline to do so. The jury heard the testimony of all the witnesses, considered direct and circumstantial evidence, observed the demeanor of the various witnesses and credited the testimony in favor of the State. These facts are a classic jury question to determine. Therefore, based on the record, the evidence was sufficient for any rational trier of fact to determine beyond a reasonable doubt that Defendant was guilty of an assault.

In conclusion, we affirm the trial court's judgment.

_____
L. TERRY LAFFERTY, SENIOR JUDGE