IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 28, 2006 Session

## STATE OF TENNESSEE v. THOMAS R. COOK, III

**Appeal from the Criminal Court for Hamilton County**
**No. 244384   Stephen M. Bevil, Judge**

---

**No. E2005-01664-CCA-R3-CD - Filed September 15, 2006**

---

The appellant, Thomas R. Cook, III, was convicted by a jury of assault, resisting arrest and carrying a dangerous weapon. As a result, the appellant was sentenced to an effective sentence of eleven months and twenty-nine days on probation after the service of thirty days in jail. After the denial of a motion for new trial, the appellant filed a timely notice of appeal. On appeal, the appellant argues that he was denied the right to testify because of an erroneous evidentiary ruling made by the trial court and that the evidence was insufficient to support his convictions. After a review of the evidence, we conclude that the evidence was sufficient to support the verdict and that the trial court erred in determining that the piece of evidence was admissible. However, because we are unable to determine from the record whether the error was reversible, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN, and J. C. MCLIN, JJ., joined.

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellant, Thomas R. Cook, III.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; Bill Cox, District Attorney General; and Barry A. Steelman, Executive Assistant District Attorney General; Neal Pinkston and Jason Thomas, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On October 26, 2002, the Chattanooga Police were dispatched to the Outback Steakhouse in response to a call reporting a disturbance with a weapon at the restaurant. Sergeant Edwin McPhearson of the Chattanooga Police Department responded to the scene and was advised by Betty Proctor, Judy McGill and Ron McGill that the appellant pulled a knife on them. Sergeant McPhearson approached the appellant in the restaurant and asked him if he was involved in the incident. According to Sergeant McPhearson, the appellant responded affirmatively and was asked to step outside. The appellant was later arrested.

Subsequently, the Hamilton County Grand Jury issued a multi-count indictment charging the appellant with felony assault, misdemeanor assault, resisting arrest and carrying a dangerous weapon.

A jury trial was held on May 11-13 of 2004. At trial, William Gable Proctor, the son of Edward and Betty Proctor, testified that he and his family, consisting of his parents and aunt and uncle, went to the Outback Steakhouse for dinner on October 26, 2002. William Proctor explained that as he finished dinner, he left the restaurant to pull the car to the front door, so that his handicapped father, Edward Proctor, would not have to walk too far to get into the car. While William Proctor remained in the car, the rest of the family started to assist Edward Proctor from the restaurant to the car.

According to William Proctor, the appellant pulled up to the front of the restaurant in a van at about the same time. Several people got out of the appellant's van. The two vehicles were facing each other. William Proctor claimed that the appellant started to blow his horn, make comments to William Proctor and his family and look generally angry. William Proctor exited his car at that time to assist his father. Judy McGill, William Proctor's aunt, held up Edward Proctor's cane and said the following to the appellant, "He's handicapped. Can't you see he's handicapped?" William Proctor stated that the appellant continued to honk his horn. William Proctor then saw Ms. McGill go to the appellant's van window and again exclaim, "He's handicapped, you know." According to William Proctor, the appellant responded, "I'll cut you up, you fat bitch" while raising a knife. The family members threatened to call the police, and the appellant called the family more names, but finally backed up and parked in another area, eventually going into the restaurant.

Several minutes later, William Proctor saw the appellant being led out of the restaurant in handcuffs. It appeared that the appellant was being "heavy-footed" and trying to make it difficult for the police to walk him to the vehicle.

Edward Proctor, William Proctor's father, testified that he is a fifty-six-year-old handicapped man. He explained that his health problems were caused by several strokes. On October 26, 2002 at the Outback Steakhouse restaurant, Mr. Proctor remembered that he "kept hearing a motor raising and a horn blowing" while his wife and family were assisting him to the car. Mr. Proctor recalled that Ms. McGill took his cane to show the appellant that they were trying to help a handicapped man to his car. Mr. Proctor also stated that he saw the appellant pull a knife on Ms. McGill.

Betty Proctor, Edward Proctor's wife, also testified at trial. According to Mrs. Proctor, she helped her husband to the car while her son William pulled the car to the front of the restaurant. As she and her husband left the restaurant, Mrs. Proctor saw the appellant's van parked out front and noticed that the appellant was continuously blowing the horn. Mrs. Proctor walked to the appellant's vehicle and asked him if he had a "problem." Mrs. Proctor was alarmed by the "rage" on the appellant's face, so she stepped back from his car. At that point, the appellant leaned over as if he was reaching for something. Mrs. Proctor got scared and walked backed to her son's car to inform Ms. McGill about the appellant's behavior. Ms. McGill then walked over to the car and informed everyone that, "He's got a knife." Mrs. Proctor did not see the knife, but immediately went into the restaurant to notify the manager and call the police.

When the police arrived, Mrs. Proctor informed the officers about the situation. Mrs. Proctor claimed that she saw the police bring the appellant outside in handcuffs, and that he was fighting the police as they were trying to get him into the police cruiser.

Ms. McGill also assisted in bringing Mr. Proctor to the car that evening. As they left the restaurant, Ms. McGill also heard the appellant honking his horn. Ms. McGill stated that she observed Mrs. Proctor walk to the appellant's car and ask him if he had a problem. When Mrs. Proctor backed away as the appellant "grabbed something," Ms. McGill picked up Mr. Proctor's cane and informed the appellant that he was "handicapped." According to Ms. McGill, the appellant pulled out a knife, called her a "fat bitch" and said that he would "slice her to pieces." Ms. McGill backed away and informed the appellant that they were going to call the police. According to Ms. McGill, the appellant responded by calling her a "whore" and telling her that he did not give a "damn." Ms. McGill was frightened by the incident.

Ms. McGill also recounted her story to the police when they arrived on the scene. She testified that she saw the appellant struggling with the police as they were trying to take him out of the restaurant.

Sergeant McPhearson testified at trial that when he responded to the scene, he located the appellant inside the restaurant. Sergeant McPhearson asked the appellant if he had a weapon. According to Sergeant McPhearson, the appellant responded affirmatively and patted his front right pocket. The appellant was asked to step outside. As the appellant and the officer were walking toward the door, Sergeant McPhearson saw the appellant place his hand in his pocket. Instinctively, Sergeant McPhearson asked the appellant to "take [his] hands out of his pocket." The appellant failed to comply after being asked to do so several times. At that point, Sergeant McPhearson stated that he grabbed the appellant's wrists and locked them so that he could not pull away. When Sergeant McPhearson tried to reach into the appellant's pocket to retrieve the knife, the appellant "went ballistic," swinging his elbow to hit Sergeant McPhearson in the chest. The appellant then went "into kind of a crouching motion," so Sergeant McPhearson grabbed the appellant, and the two men went to the ground. Simultaneously, Sergeant McPhearson called for backup. The appellant began to curse and scream. Sergeant McPhearson was concerned with the high potential for civilian injuries, so he attempted to get the appellant outside the restaurant with the help of a mall security

officer. The appellant was yelling, trying to kick and resisting. Once they were outside, Sergeant McPhearson told the appellant to get on the ground. The appellant was handcuffed while he was still kicking. Sergeant McPhearson heard the appellant comment, "I'm a fucking doctor, I'll have your badge." Sergeant McPhearson testified that after the appellant was secured in the police cruiser, he asked the people outside the restaurant if they witnessed the incident. No one came forward with any information.

Officer Mark Bender arrived on the scene in response to the call for backup. Officer Bender retrieved the knife from the appellant's front right pocket and helped escort the appellant to the car. The appellant was "bowing" his back to resist arrest and would not get into the police cruiser. After Sergeant McPhearson threatened to use his mace spray, the appellant eventually complied by getting into the police cruiser. As Officer Bender placed the appellant into the cruiser, he removed one of the appellant's handcuffs to allow the appellant to take his watch off and hand it to his son.

The knife was just under four and one-half inches long. Officer Bender attempted to talk to the victims, the appellant's family and any witnesses after securing the appellant in the cruiser. Officer Bender testified that a lot of people did not want to get involved and no one that he spoke with wanted to give an official statement about the incident.

Gwendolyn Renae Taylor Jackson testified on behalf of the appellant. Ms. Jackson testified that she was at the restaurant during the incident. Ms. Jackson waited outside the restaurant while she was waiting for her friends Tamara Henderson and Connie Gates to arrive. While waiting, Ms. Jackson saw both William Proctor and the appellant pull their vehicles up to the front of the restaurant. Ms. Jackson claimed that a woman exited Mr. Proctor's vehicle, approached the appellant's vehicle and attacked the appellant, hitting him and his van with a cane. Ms. Jackson never saw a handicapped man. When the lady left, the appellant parked his van and went into the restaurant. Ms. Jackson stated that she did not hear the appellant honk his horn or "rev" his engine. Further, Ms. Jackson never saw the appellant with a knife. Ms. Jackson's friends arrived after the appellant entered the restaurant, but she told them what she saw.

After Ms. Jackson's friends arrived, two police officers went into the restaurant. The police officers soon came back outside, dragging the appellant. Ms. Jackson did not see the appellant resist the officers, yell or utter profanities. Ms. Jackson testified that one of her friends knew one of the police officers and called the officer over to talk to Ms. Jackson. Ms. Jackson claimed that she told the officer that the appellant did not do anything. Ms. Jackson remembered giving her contact information to the police, but claimed that she was never contacted by anyone about the incident.

Connie Gates arrived at the restaurant after the incident occurred. However, Ms. Gates saw the police officers go into the restaurant and bring the appellant outside. Ms. Gates testified that the officers had the appellant on the ground, but that the appellant was not resisting arrest. The appellant asked repeatedly, "What did I do, what did I do?" Ms. Gates also stated that none of the officers asked her if she was a witness to the incident.

Tamara Woodard Henderson was also outside the restaurant when the police brought the appellant outside. Ms. Henderson remembered that two young men came out and approached the appellant and the police told them to get back. Ms. Henderson stated that the appellant was not resisting or yelling at the police. Ms. Henderson recognized Sergeant McPhearson at the scene. Ms. Henderson testified that she and Sergeant McPhearson were childhood friends. Ms. Henderson spoke with Sergeant McPhearson at the scene and informed him that there were witnesses to the incident. Sergeant McPhearson instructed the women to wait at the scene. According to Ms. Henderson, several officers spoke to the witnesses, but none of them took any contact information from the witnesses.

Thomas Roland Cook, Jr., the appellant's father, was at the restaurant the day of the incident. The appellant pulled up to the front of the restaurant to let him out of the van. Mr. Cook remembered seeing another car parked at the front of the restaurant when they pulled up. Mr. Cook testified that he saw the police enter the restaurant and talk to the appellant, but that he could not hear what the police were saying because he was too far away. Mr. Cook saw the appellant place his hands on top of his head. According to Mr. Cook, the police officers put the appellant's hands behind his back and pushed him through the door of the restaurant. Mr. Cook did not see the appellant fight the officers or resist the arrest.

Gina Cook, the appellant's stepmother, also saw the police grab the appellant and push him through the door. Ms. Cook did not see the appellant resist the officers or place his hands in his pockets while he was being escorted outside.

Katelin Cook, the appellant's daughter, was waiting with Mr. and Ms. Cook inside the restaurant when the police arrived. She also claimed that the appellant did not resist or strike an officer as he was being led out of the restaurant. Katelin Cook recognized the knife that the appellant was carrying and testified that it belonged to her father. However, Katelin Cook stated that she had never seen the appellant carry the knife in his pocket before.

Will Jones, a friend of the appellant's son, was outside the restaurant with the appellant's son waiting for the appellant and others to arrive at the restaurant that evening. While Mr. Jones and the appellant's son were waiting, Mr. Jones saw the appellant pull up in front of the restaurant facing another car. According to Mr. Jones, the appellant could not pull his van around the car that was blocking the front of the restaurant, so the appellant honked his horn. When the other car did not move, the appellant honked his horn again. Mr. Jones saw a handicapped man trying to get into the other car.

Mr. Jones next testified that he saw a woman approach the appellant's van with a cane. The woman was screaming and beating on the window with the cane. Mr. Jones never saw the appellant roll down his window. Mr. Jones stated that the woman said, "He's got a knife." At that point, the appellant backed up his van, parked and went into the restaurant to join his family. Mr. Jones did not hear the appellant say anything to the other people as he was walking into the restaurant.

Mr. Jones was in the restaurant standing near the appellant when the police arrived. Mr. Jones testified that the appellant admitted that he had a knife and told the police that it was in his "front pocket." Mr. Jones said that the police then "tackled [the appellant] out the front door onto the concrete." While the appellant was lying on the ground, Mr. Jones saw a police officer with his knee on top of the appellant's head "grinding" it into the concrete. Mr. Jones claimed that the appellant never resisted the arrest by the officers.

At the conclusion of the proof, the jury found the appellant guilty of assault, resisting arrest and carrying a dangerous weapon. After a sentencing hearing, the appellant was sentenced to an effective sentence of eleven months and twenty-nine days on probation after the service of thirty days in jail. On appeal, the appellant argues that the trial court incorrectly ruled that a letter written by the appellant to a newspaper would be admissible if the appellant testified at trial, thereby depriving the appellant of the right to testify. Further, the appellant challenges the sufficiency of the evidence.

Analysis

The appellant first claims on appeal that he was effectively denied the right to testify at trial because of an erroneous evidentiary ruling by the trial court. Specifically, the appellant challenges the trial court's preliminary decision that a letter written by the appellant to a newspaper about an unrelated incident would be admissible to show the appellant's character and propensity to commit the crime if the appellant testified at trial. The State argues that the appellant waived the issue on appeal by failing to make an offer of proof and, in the alternative, that the trial court did not abuse its discretion in ruling that the letter was admissible.

During a break in the trial, counsel for the appellant made a motion in limine requesting that the State be prohibited from asking the appellant about a prior arrest that had been expunged. The trial court determined that because it was an arrest rather than a conviction, it would not be relevant. However, the trial court determined that if the arrest "became relevant during the course of the testimony" that there would be a jury-out hearing on the matter. The previous arrest for disorderly conduct and resisting arrest involved a similar incident with police.

Next, counsel for the appellant informed the trial court that there was a letter written by the appellant to the newspaper in regard to the expunged arrest in which there were "certain allegations in regard to law enforcement officers." Counsel for the appellant expressed his concern that the appellant would "open the door" to cross-examination or introduction of the letter by testifying in regard to his character that he was a Vietnam veteran and recipient of the distinguished Flying Cross. The trial court determined:

> Well, I think in light of if he's going to take the stand and talk about his service to the country and his distinguished service medal, I think that presents a picture to the jury that this is one who's very patriotic, loves his country and totally law-abiding and willing to fight for his country. This letter, I think, is something that the jury would be entitled to see, as far as his opinions, which sort of gives a different slant on this

patriotic medal-winning attitude. It sort of pokes, takes a lot of jabs at our government and law enforcement and our leaders and everything else.

I will be inclined, if he does take the stand and that information is presented, to allow the State to present this letter, but I think we can exclude the part about his personal experience, or the personal case that he had, . . . , how he went to court. If you can extract that portion of it, the rest of the letter I think would be admissible toward character, in the context of his Vietnam service and his medal.

The trial court further determined that the letter would be admissible under Tennessee Rule of Evidence 405(b) as a reference to specific instances of conduct, "which go toward his character" and under Rule 404(b) "to show his intent." At the conclusion of the discussion, counsel for the appellant informed the trial court that the appellant would not be testifying, but that they needed some time "to make an offer of proof for the appellant record." At the conclusion of the testimony of Will Jones, counsel for the appellant informed the trial court that they needed a break. The next entry in the transcript states that "other proceedings were had which were reported but not transcribed herein." It is not clear from the record before this Court if the appellant ever made an offer of proof.[1] At the hearing on the motion for new trial, counsel for the appellant stated that the appellant did not testify at trial.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). In order to be admissible, evidence must be relevant and probative to an issue at trial. State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996); see also Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded at trial if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403.

We fail to see how a letter written by the appellant to a newspaper about an unrelated incident that occurred nearly thirteen years prior to trial was relevant to the case herein. The fact that the appellant wrote a letter in which disparaging remarks were made about law enforcement does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In other words, the letter did nothing to prove that the appellant was guilty of the crimes as

---

[1] In the appellant's brief on appeal, counsel for the appellant admits that an offer of proof was never made at trial.

-7-

charged. Moreover, it had nothing to do with the appellant's credibility. Again, the determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). However, we determine that the letter was not relevant, so we must conclude that the trial court abused its discretion in ruling that the letter would be admissible if the appellant testified.

We review a trial court's erroneous admission of evidence under a harmless error standard. See Tenn. R. Crim. P. 52(a). Thus, the appellant is not entitled to relief on this issue unless the trial court's error affirmatively appears to have affected the result of the trial on the merits. See id. In the case herein, we are unable to discern from the record whether the trial court's error was reversible because the appellant made no offer of proof as to what the substance of his testimony would have included. In order for an appellate court to review an alleged error in the exclusion of evidence, "it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible." State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001). Without the appellant's potential testimony, it is impossible to determine if the State would have sought to introduce the letter into evidence. Thus, appellant has failed to show that the trial court's error affirmatively affected the result of the trial. Consequently, the error must be deemed harmless.

Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions for assault and resisting arrest. The appellant does not challenge his conviction for carrying a dangerous weapon. Specifically, the appellant argues that the testimony of "Proctor and McGill . . . is unreasonable while the three disinterested witnesses' vers[i]on of the events is much more credible," and that "Mrs. McGill's testimony of the events does not show . . . reasonable fear of bodily injury." The State contends that the evidence is "ample" to support the verdict.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929

S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, it is well-settled that all questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not an appellate court. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000).

## A. Assault

In order to convict the appellant of assault, the State was required to prove that the appellant "intentionally or knowingly cause[d] another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2).

In the light most favorable to the State, the evidence revealed that the appellant pulled his van up to the front of the Outback Steakhouse while Judy McGill was assisting Edward Proctor to his car. William Proctor's car was parked facing the appellant's van. While Mr. Proctor was walking to his car, the appellant continuously honked his horn. Ms. McGill approached the appellant's van with Mr. Proctor's cane to show to the appellant that he was handicapped. In response, the appellant called her a "fat bitch," pulled out a knife that was over four inches long and threatened to "slice [her] to pieces." Ms. McGill backed away from the car and asked someone to call the police. At trial, Ms. McGill testified that she was very frightened when the appellant pulled out the knife. William Proctor verified that the appellant brandished the weapon and heard the appellant threaten Ms. McGill. Sergeant McPhearson recovered a knife from the appellant's right front pocket. While there was conflicting testimony from Ms. Jackson about the events occurring outside the restaurant, the jury was responsible for adjudging the credibility of the witnesses and the weight and value to be given to the evidence. We conclude that the evidence was sufficient for the jury to determine that the appellant assaulted Ms. McGill. This issue does not merit relief.

## B. Resisting Arrest

The appellant also challenges his conviction for resisting arrest. Tennessee Code Annotated section 39-16-602 sets out the elements of resisting arrest. That statute states:

> It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at such officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

Tenn. Code Ann. § 39-16-602(a). Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. §39-11-106(a)(12).

The evidence introduced at trial, viewed in the light most favorable to the State, shows that the appellant assaulted Ms. McGill prior to entering the restaurant. When the police arrived at the restaurant, they approached the appellant and asked him if he was involved in the incident. The appellant responded affirmatively and admitted that he had a knife in his pocket. While the appellant was initially cooperative, he attempted to place his hands in his pockets as he was instructed to exit the restaurant. The officers asked the appellant repeatedly to remove his hands from his pockets. When the appellant failed to comply, Sergeant McPhearson restrained the appellant's hands and tried to reach into the pocket to retrieve the knife. According to Sergeant McPhearson, the appellant "went ballistic," elbowing Sergeant McPhearson. The situation escalated and the two men ended up on the ground. At that point, Sergeant McPhearson called for backup. The appellant began to curse and scream, even trying to kick Sergeant McPhearson at one point. Once the appellant was handcuffed, he continued to resist his arrest. Officer Mark Bender corroborated Sergeant McPhearson's version of the events. Officer Bender recalled that the appellant was pushing and very non-compliant as Officer Bender tried to place him in the police cruiser. Several witnesses also testified that they saw the appellant resisting arrest.

After a review of the evidence, we conclude that there was sufficient evidence for a jury to convict the appellant of resisting arrest.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE